# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Red Rhino Leak Detection, Inc.,

        Plaintiff and Counterclaim
        Defendant,

v.

Anderson Manufacturing Company, Inc.,

        Defendant and
        Counterclaimant.

File No. 17-cv-2189 (ECT/DTS)

**OPINION AND ORDER**

---

Mark F. Warzecha and Kelly G. Swartz, Widerman Malek, PL, Melbourne FL, and Jack E. Pierce, Bernick Lifson, Minneapolis MN for Plaintiff and Counterclaim Defendant Red Rhino Leak Detection, Inc.

Devan V. Padmanabhan and Erin O. Dungan, Padmanabhan & Dawson, PLLC, Minneapolis, MN for Defendant and Counterclaimant Anderson Manufacturing Company, Inc.

---

This is a patent-infringement case. Plaintiff Red Rhino Leak Detection owns U.S. Patent No. 9,464,959 ("the '959 Patent"). Red Rhino alleges that a "light tester" product sold by Defendant Anderson Manufacturing Company violated the '959 Patent. It's more complicated than this, but described at a very high level, Red Rhino's '959 Patent and Anderson's light tester are devices that may be used to detect leaks in swimming pools. In response to Red Rhino's complaint, Anderson answered and asserted counterclaims seeking a declaratory judgment of invalidity or, failing that, then non-infringement. Red Rhino and Anderson have presented four matters for decision: First, Anderson requested

claim construction with respect to four[1] disputed claim terms pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390–91 (1996). Second, Anderson moved for summary judgment on the basis "that Anderson does not infringe [the '959 Patent] and/or that the '959 Patent is invalid." That motion does not specifically reference Anderson's counterclaim for declaratory relief but necessarily encompasses it. Third, Anderson has moved to exclude the expert testimony of a Red Rhino witness pursuant to Federal Rule of Evidence 702. Fourth, Red Rhino has filed a summary-judgment motion of its own as to each count of its Complaint. Red Rhino has not moved for summary judgment as to Anderson's counterclaim seeking a declaratory judgment, but a ruling in Red Rhino's favor would require dismissal of those counterclaims.

I

Anderson has moved to exclude the testimony of Glen Stevick, Red Rhino's expert on claim construction, infringement, anticipation, obviousness, and indefiniteness. *Daubert* Mot. [ECF No. 64]; Anderson Br. at 38 [ECF No. 66]. Because the resolution of this motion has the potential to affect what evidence properly may be considered in the Parties' other motions, the *Daubert* motion will be addressed first. Stevick's testimony will be admitted.

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. That rule provides:

---

[1] Originally, Anderson sought claim construction as to five different terms, *see* ECF No. 40-1 at 2, but it submitted briefing with respect to only the four terms addressed in this Opinion and Order.

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)    the testimony is based on sufficient facts or data;
>
> (c)    the testimony is the product of reliable principles and methods; and
>
> (d)    the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). "District courts have wide latitude in determining whether an expert's testimony is reliable." *Olson v. Ford Motor Co.*, 481 F.3d 619, 626 (8th Cir. 2007) (citation omitted). As long as the evidence indicates that the expert evidence is reliable and relevant, "no single requirement for admissibility" governs. *Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1011 (8th Cir. 2005). The proponent of the expert opinion bears the burden of showing, by a preponderance of the evidence, that the testimony satisfies Rule 702. *Khoury v. Philips Med. Sys.*, 614 F.3d 888, 892 (8th Cir. 2010) (citations omitted). "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (citation omitted).

The Federal Circuit has held that "it is an abuse of discretion to permit a witness to testify as an expert on the issues of noninfringement or invalidity unless that witness is

qualified as an expert in the pertinent art." *Sundance, Inc. v. DeMonte Fabricating, Ltd.*, 550 F.3d 1356, 1363 (Fed. Cir. 2008). Although *Sundance* involved the admissibility of expert testimony on issues of infringement and invalidity, Anderson seems to argue (and Red Rhino does not seem to disagree) that the holding of *Sundance* applies more broadly to any "issue [that] calls for consideration of evidence from the perspective of one of ordinary skill in the art," such as claim construction. *Id.*; *see also Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) ("[E]xtrinsic evidence in the form of expert testimony can be useful to a court . . . to ensure that the court's understanding of the technical components aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field."). When offered for such purposes, "[t]estimony proffered by a witness lacking the relevant technical expertise fails the standard of admissibility under [Rule] 702." *Sundance*, 550 F.3d at 1363. To determine the relevant field of art in a given case, courts "must look to the nature of the problem confronting the inventor." *Verizon Servs. Corp. v. Cox Fibernet Va., Inc.*, 602 F.3d 1325, 1338 (Fed. Cir. 2010) (citation omitted). "One factor bearing on the determination of the relevant art is the type of skill required to understand the disclosure of the . . . patent" in suit. *Orthopedic Equip. Co. v. United States*, 702 F.2d 1005, 1008 (Fed. Cir. 1983) (per curiam).

Stevick's qualifications are extensive. He earned a Ph.D. and an M.S. from the University of California, Berkeley, and also earned a B.S. from Michigan Technological University, all in the field of mechanical engineering. Warzecha Decl. Ex. A-18 at 1 [ECF No. 83 at 129]. He is a member of the American Society of Mechanical Engineers and a

co-founder of, and consulting engineer with, Berkeley Engineering and Research, Inc. ("BEAR"), where he was previously a director and principal. *Id.* at 1–2. BEAR is a multi-disciplinary engineering laboratory through which Stevick has provided engineering services relating to various mechanical, fluid-flow, and electrical devices and systems. *Id.* at 2. Over his 35 years of professional experience as a mechanical engineer, he has designed or worked on leak-detection systems for a number of clients. *Id.* at 1. Although he does not have experience detecting leaks in swimming pools specifically, he has worked on leak-detection problems in other contexts, including gasoline tanks, pipes, and vessels. Warzecha Decl. Ex. A-12 ("Stevick Dep.") at 17 [ECF No. 84 at 18]. He has not personally used the accused product to detect leaks in a pool but observes that "they are pretty simple in their configuration. And just using the laws of physics, you know exactly how they work." Stevick Dep. at 17–18.

Anderson argues nonetheless that Stevick's testimony must be excluded because he is not "qualified as an expert in the pertinent art." *Sundance*, 550 F.3d at 1363; *see* Def.'s Mem. in Supp. at 41–44. Anderson's expert defines a "person of ordinary skill in the art of the '959 Patent" as someone who has "at least two (2) years of experience working in the area of swimming pool leak detection." Anderson Expert Disclosures at 9 n.2 [ECF No. 71 at 10]. Neither Party has spent considerable effort defining a person of ordinary skill in the art for purposes of this case, but Stevick testified in his deposition that "anyone with a couple years of experience dealing with pools and their leaks would be qualified, a POSA [person of ordinary skill in the art,] *or more certainly an engineer would qualify*." Stevick Dep. at 35 (emphasis added).

Essentially, then, Anderson's *Daubert* motion boils down to whether a person of ordinary skill in the pertinent art must have experience detecting leaks in swimming pools (as Anderson contends), Anderson Expert Disclosures at 9 n.2, or whether an engineer who lacks direct experience detecting leaks in swimming pools but who is otherwise familiar with the laws of hydrodynamics and has experience detecting leaks in non-swimming-pool contexts may also qualify as a person of ordinary skill in the relevant art. Anderson does not explain why experience detecting leaks in swimming pools differs in any discernible way from experience detecting leaks in other contexts, nor is it immediately apparent why that would be so. The '959 Patent is not limited to swimming pool leak detection. It describes a system and method for detecting leaks in a fluid-filled vessel. Warzecha Decl. Ex. A-1 at 1 ("'959 Patent") [ECF No. 83 at 7]. Although claim 1 of the '959 Patent expressly refers to "[a] leak detecting device for swimming pool lights in a water filled swimming pool," *id.* at 4:45–46, the abstract and specification both describe a swimming pool as an example—perhaps the primary example, though not necessarily the only example—of the type of fluid-filled vessel in which the '959 Patent may be used. *See id.* at 1:14–15 (stating that the invention related to "a system and method for detecting leaks in a liquid filled vessel such as a swimming pool"); 1:32–34 (similar); 1 (similar). The title of the patent itself makes clear that the patent relates to the "detect[ion of] leaks in a fluid filled vessel," more broadly. *Id.* at 1; *Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1375 (Fed. Cir. 2004) (concluding that the district court erred in excluding testimony from a witness who was an expert in stable value investments but not in life insurance administration, where the abstract and title of the patent made clear that the

patent related to both fields). Here, the nature of the problem facing the inventor expressly was not limited to swimming pools, as opposed to other fluid-filled vessels, and Anderson does not attempt to explain how having expertise specific to swimming pools, or swimming-pool-leak detection, would be necessary to understand the disclosure of the '959 Patent. *See Orthopedic Equip.*, 702 F.2d at 1009 ("In determining the relevant art of the claims in suit one looks to the nature of the problem confronting the inventor." (citation omitted)). Furthermore, Anderson does not argue that the relevant scientific principles apply any differently to detecting leaks from swimming pools than they do to detecting leaks from any other fluid filled vessel, such as those with which Stevick has experience.

Given Stevick's training and professional experience, and in particular his work on leak-detection systems in a variety of contexts including gasoline tanks, pipes, and vessels, Stevick plainly qualifies as a technical expert in the art of detecting fluid leaks, and his expert testimony is relevant and material to this case. *See Shelcore, Inc. v. Durham Indus., Inc.*, 745 F.2d 621, 625 (Fed. Cir. 1984) (holding that district court did not abuse its discretion in permitting expert testimony of witness in a case involving patents related to a driving-simulator toy where the proffered expert was not a toy designer but was an expert in plastics manufacturing). Anderson's motion to exclude Stevick's testimony will be denied.

II

Because it is essential to know what the relevant claim terms mean before determining whether any Party is entitled to summary judgment in this case, the next issue must be claim construction. Courts, not juries, construe patent claims. *Markman v.*

*Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996). In general, claim language means whatever it would have meant, ordinarily and customarily, to a person of ordinary skill in the relevant art at the time the patent application was filed. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc). Sometimes the ordinary and customary meaning of claim language to a person of ordinary skill in the art may be identical to the meaning of that language to a lay person who is not skilled in the art. *See id.* at 1314 (acknowledging that claim construction sometimes "involves little more than the application of the widely accepted meaning of commonly understood words" (citation omitted)). Here, neither Party argues that a person of ordinary skill in the art would understand a disputed claim term any differently than would an educated member of the lay public.

"The intrinsic record in a patent case is the primary tool to supply the context for interpretation of disputed claim terms." *V-Formation, Inc. v. Benetton Grp. SpA*, 401 F.3d 1307, 1310 (Fed. Cir. 2005) (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1592 (Fed. Cir. 1996)). Such intrinsic evidence includes "the words of the claims themselves, the remainder of the specification, [and] the prosecution history," which consists of "the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1314, 1317 (citations omitted). The prosecution history of a parent application also constitutes intrinsic evidence that may be useful in construing claim terms. *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999). "[T]he specification 'is always highly relevant to the claim

construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp.*, 90 F.3d at 1582).

Courts also may rely on "extrinsic evidence"—that is, "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317 (citations omitted). Extrinsic evidence "can shed useful light on the relevant art," but it "is less significant than the intrinsic record in determining the legally operative meaning of disputed claim language." *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004) (internal quotation marks and citation omitted); *see Phillips*, 415 F.3d at 1317. Extrinsic evidence is considered "less reliable" than intrinsic evidence and may not be used to contradict the intrinsic evidence. *Phillips*, 415 F.3d at 1318; *Mantech Envtl. Corp., v. Hudson Envtl. Servs., Inc.*, 152 F.3d 1368, 1373 (Fed. Cir. 1998).

Courts depart from the plain and ordinary meaning of a claim term only "when a patentee acts as his own lexicographer" or "when the patentee disavows the full scope of the claim term in the specification or during prosecution." *Poly-Am., L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016) (citations omitted). "[A]n inventor may disavow claims lacking a particular feature when the specification describes 'the present invention' as having that feature." *Id.* (citation omitted). "While disavowal must be clear and unequivocal, it need not be explicit." *Id.* (citation omitted). "The standard for disavowal is exacting, requiring clear and unequivocal evidence that the claimed invention includes or does not include a particular feature. Ambiguous language cannot support disavowal."

*Cisco Sys., Inc. v. Int'l Trade Comm'n*, 873 F.3d 1354, 1361 (Fed. Cir. 2017) (citations

omitted).

In their *Markman* briefing, the Parties dispute the meaning of the following claim

terms:

- "an inlet . . . to selectively deliver fluid through the inlet into the interior of the housing";

- "or deliver a dye solution for leak detection purposes into the interior of the housing";

- "the seal being for causing the device to be fixed or secured in one place"; and

- "the defined underwater surface of the swimming pool being about a component related to being partly in a passage from inside the pool to a position removed from the surface"

Anderson Br. at 10–15. Each of these terms is located in claim 1, which in its entirety

provides as follows:

> A leak detecting device for swimming pool lights in a water filled swimming pool comprising:
>
> a ring shaped annular resilient seal adapted to contact a surface of the swimming pool underwater and create a seal between the resilient seal and the underwater surface of the swimming pool, the underwater surface being a defined area with a defined perimeter about which the seal engages, the seal having a central opening; ***the seal being for effecting anchoring*** in a sealing engagement around the perimeter and being in a stationary non-movable position relative to the defined underwater surface of the swimming pool, ***the defined underwater surface of the pool being about a component related to being partly in a passage from inside the pool to a position removed from the surface***, and such component selectively being a swimming pool light;

a rigid housing having a threaded rod extending through said housing, said treaded [sic] rod terminating in a suction cup of a resilient material for anchoring said housing to an underwater surface, said housing hollow on its interior, coupled to the resilient seal having an opening therethrough and having ***an inlet*** extending into the opening and accessible from the exterior ***to selectively deliver fluid through the inlet into the interior of the housing***, or for coupling a flow meter thereto to detect the flow of water into or out of said housing, ***or deliver a dye solution for leak detection purposes into the interior of said housing*** and through the central opening of the resilient seal, the housing being transparent whereby the flow of dye in the hollow housing is observable by a user of the device;

the device being for determining leakage underwater within the defined perimeter relative to the defined underwater surface of the swimming pool, and

the housing being operable submerged below water level, the threaded rod and section cup within the housing being visible from outside the housing.

'959 Patent at 4:45–5:14 (emphases added). The disputed terms will be addressed in turn, but it is necessary first to address a general disclaimer argument Anderson presents.

A

Anderson first argues, without reference to any particular claim term, that in the course of prosecuting the '959 Patent, Red Rhino generally disclaimed any interpretation of any claim that otherwise would include "any device requiring removal of the light and dye testing of the light niche for leaks." Anderson Br. at 5. The doctrine of "[p]rosecution disclaimer preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d

1353, 1359 (Fed. Cir. 2017) (second emphasis in original) (internal quotation marks and citation omitted). Disclaimer through prosecution occurs only where "the alleged disavowing actions or statements made during prosecution [are] both clear and unmistakable"—that is, "when the patentee unequivocally and unambiguously disavows a certain meaning to obtain a patent." *Id.* (citations omitted).

Anderson does not identify specifically what claim term it believes was narrowed through prosecution history of the '959 Patent. Rather, it argues that the patent's prosecution history amounts to a "global disclaimer" of any device that requires a light to be removed and subsequent dye testing to be performed before the location of a leak can be identified. Anderson Br. at 5; *see also id.* at 1. After the examiner rejected the claims as unpatentable over the prior-art patents of McGuigan in view of Barker, Red Rhino distinguished its invention from McGuigan on grounds including that McGuigan "cannot be secured to a pool surface," "does not disclose the use of a dye, or the use of a transparent structure to allow visualization of the dye movement," and "fails to disclose a device capable of detecting leaks in swimming pool components." Dungan Decl. Ex. 2 at RR000300 [ECF No. 68-1 at 32]. By contrast, Red Rhino told the examiner, its own "device attaches to the component itself to accurately detect if the component is leaking using a clear dome that allows visual sighting of an injection of a tracer fluid." *Id.* Furthermore, Red Rhino explained to the examiner that "[p]rior to the Applicant's invention, leak testing of the swimming pool light required the physical removal of the light and the use of a d[y]e and need to check every area of the light niche, and then reassembly of the pool light was required." *Id.* According to Anderson, those statements

disavow any construction of the '959 Patent that would cover a device that requires disassembly of the light to detect a leak. Anderson Br. at 9.

But the alleged disavowal—if it could be understood as such—is not clear and unmistakable, such that all other meanings are unambiguously disclaimed. *Aylus*, on which Anderson relies, provides a useful starting point and counter-example. There, the owner of a patent providing systems and methods for implementing digital home networks stated in an inter partes review response that the challenged claims "require" certain components of the network to interact in a particular way, and thereby unequivocally and unambiguously disavowed alternative constructions. 865 F.3d at 1362–63. Here, by contrast, Red Rhino made no representations—or at least, it made no unambiguous and unequivocal representations—that its invention would never require disassembling the component undergoing testing to pinpoint the leak. To be sure, Red Rhino distinguished its invention from McGuigan, which *always* requires disassembly of the component. But the opposite of "always" is not "never," it is merely "not always"—a concept that encompasses "sometimes" as fully as it does "never." Thus, Red Rhino's statements to the examiner could be understood readily to mean that Red Rhino claimed an advantage over McGuigan because its invention does *not always* require disassembly of the component— that is, in some circumstances, it will not require disassembly but in others it might. Similarly, while Red Rhino's response to the examiner referenced the use of dye or tracer fluid, Dungan Decl. Ex. 2 at RR000300, those references could quite reasonably be understood to mean that, unlike McGuigan, which does not disclose the use of a dye, Red Rhino's invention can be—though it need not be—used with a dye or tracer fluid. *See,*

*e.g.*, '959 Patent at 5:3–4 (a user may "coupl[e] a flow meter" to the device to monitor whether water is flowing into or out of the device's housing). Thus, when Red Rhino said that its invention's transparent dome "*allows* visual sighting of" tracer fluid, Dungan Decl. Ex. 2 at RR000300 (emphasis added), or when it told the examiner reviewing the parent application to the '959 Patent that its invention would "*allow* the determination visually of a leak within a component" and that a tracer dye would "*permit* visual[ detection of the] location of the leak," '959 Patent at 1 (identifying parent application, Patent Application No. 13/838,618); Dungan Decl. Ex. 3 at RR000086–87, RR000114–15 (excerpts from prosecution history of the parent application to the '959 Patent) (emphasis added) [ECF No. 68-1 at 86–87, 107–08], for example, it did not unequivocally and unambiguously disavow any construction of the claim that would "allow" or "permit" some other form of leak detection, including one that might not allow a user to pinpoint the location of a leak within a component.

Furthermore, Anderson's global-disclaimer argument cannot be reconciled with claim 1 itself, either in the amended version before the patent examiner as part of the same submission in which Red Rhino made the statements Anderson now characterizes as a global disclaimer, or as it ultimately appears in the '959 Patent. Both of those versions of claim 1 describe an inlet capable of detecting leaks in any of three ways, including by "coupling a flow meter thereto to detect the flow of water into or out of said housing." '959 Patent at 5:3–4; Dungan Decl. Ex. 2 at RR000295. But such an application of the device would not permit a user to observe the flow of any tracer fluid within the housing toward the location of a leak—it does not reference or otherwise suggest the use of any

tracer fluid—and use of this functionality specifically referenced in the claim therefore would require disassembly of the component in order to pinpoint the location of the leak.[2] This incompatibility between Anderson's global-disclaimer argument and claim 1 further highlights why Red Rhino's statements to the patent examiner are not so clear and unmistakable that they amount to a disclaimer.

## B

Anderson seeks construction of two claim terms that relate to the inlet in the device's rigid housing, bolded below in their fuller context:

> a rigid housing having a threaded rod extending through said housing, said treaded [sic] rod terminating in a suction cup of a resilient material for anchoring said housing to an underwater surface, said housing hollow on its interior, coupled to the resilient seal having an opening therethrough and having ***an inlet*** extending into the opening accessible from the exterior ***to selectively deliver fluid through the inlet into the interior of the housing***, or for coupling a flow meter thereto to detect the flow of water into or out of said housing, ***or deliver a dye solution for leak detection purposes into the interior of said housing*** and through the central opening of the resilient seal, the housing being

---

[2]     Red Rhino might take issue with this framing, given its repeated arguments that functional limitations may not be read into apparatus claims during claim construction. Red Rhino Br. at 13 [ECF No. 81]. It is true that the Federal Circuit has held that "[a]n invention claimed in purely structural terms generally resists functional limitation." *Toro Co. v. White Consol. Indus., Inc.*, 266 F.3d 1367, 1371 (Fed. Cir. 2001) (citation omitted). But it is equally clear that it is "entirely proper to consider the functions of an invention in seeking to determine the meaning of particular claim language." *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005); *see also Cordis Corp. v. Medtronic Ave, Inc.*, 511 F.3d 1157,1179–80 (Fed. Cir. 2008) (construing claim limitations functionally where supported by the intrinsic record). Here, the claim itself describes functional aspects of the invention by describing three ways the inlet may be used to detect leaks, and it therefore makes sense to use those aspects of the claim to aid in claim construction.

> transparent whereby the flow of dye in the hollow
> housing is observable by a user of the device[.]

'959 Patent at 4:62–5:8.  Because the appropriate construction of those terms is informed

by whether and how they interrelate in context, they are discussed in tandem here.  *See*

*Phillips*, 415 F.3d at 1314 ("[T]he context in which a term is used in the asserted claim can

be highly instructive.").

First, Anderson proposes that "an inlet . . . to selectively deliver fluid through the

inlet into the interior of the housing" should be understood to mean "an inlet structure . . .

to deliberately inject or force fluid through the fluid inlet structure into the inside of the

housing at the selection of the operator."  Anderson Br. at 10 (alterations in original).  Red

Rhino argues that no construction of this claim term is necessary and that it should be given

its plain and ordinary meaning.[3]  Red Rhino Br. at 18.  Anderson acknowledged at oral

argument that there is no meaningful difference between the claim's use of the term "inlet"

and Anderson's proposed construction of "inlet structure," or between the claim's use of

the term "into the interior of the housing" and Anderson's proposed construction of "into

the inside of the housing."  Only claim terms that are actually "in controversy" need to be

construed, and then "only to the extent necessary to resolve the controversy."  *Vivid Techs.,*

*Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) (citation omitted).  Thus,

the Court need not construe the terms "inlet" or "into the interior of the housing," and will

---

[3]  With respect to this and all other disputed claim terms at issue in the *Markman* briefing, Red Rhino's expert testified that a person of ordinary skill in the art "would understand it just the way it's written.  Nothing here requires rewriting, per se."  Stevick Dep. at 35 [ECF No. 84].

instead focus on what it means to "selectively deliver fluid through the inlet," '959 Patent at 5:1–2.

Second, Anderson proposes that the term "or deliver a dye solution for leak detection purposes into the interior of the housing" be construed to mean "or inject or force a dye solution into the inside of the housing, where it is used therein to detect leaks." Anderson Br. at 10.  Once again, Red Rhino argues that no construction of this claim term is necessary and that it should be given its plain and ordinary meaning.  Red Rhino Br. at 24.

As an initial matter, construing these terms requires the Court to determine how the word "selectively" functions in the claim language excerpted above.  At the hearing, the possibility that the word "selectively" introduced and applied to all three potential functionalities was explored—in other words, that a user could select any one of the three listed options, and the structure of the inlet is such that it would permit whichever option the user selected.  That construction, however, cannot be reconciled with the grammatical structure of the claim.  In particular, as both Parties acknowledged during the hearing, although it would make sense grammatically for "an inlet . . . to . . . deliver fluid through . . . the interior of the housing" or for "an inlet . . . to . . . deliver a dye solution for leak detection purposes into the interior of said housing," depending on which of those options the user selected, it would make no sense for "an inlet . . . to . . . for coupling a flow meter thereto to detect the flow of water into or out of said housing."  '959 Patent at 4:67–5:6.  "A claim must be read in accordance with the precepts of English grammar."  *In re Hyatt*, 708 F.2d 712, 714 (Fed. Cir. 1983).

The only grammatically sound reading of this portion of the claim requires that the word "selectively" be read as modifying only the first of the three distinct leak-detecting functions that may be enabled by the inlet in the rigid housing. Those three leak-detecting functions are, first, "selectively deliver[ing] fluid through the inlet into the interior of the housing, or"; second, "for coupling a flow meter [to the inlet] to detect the flow of water into or out of [the] housing"; or third, "deliver[ing] a dye solution for leak detection purposes into the interior of said housing and through the central opening of the resilient seal." '959 Patent at 5:1–7. In this last potential function, the transparent housing permits the user to observe "the flow of dye in the hollow housing" as it enters "into the interior of [the hollow] housing and through the central opening of the resilient seal"—that is, through the inlet, into the hollow housing, and through the water it contains; if there is a leak, the dye will then flow out the central opening of the resilient seal and into or toward the site of the leak. *Id.* at 5:5–8.

The fact that the adverb "selectively" modifies the verb "deliver" only with respect to the first potential function of the inlet as described in claim 1—"to selectively deliver fluid"—and not to the third potential function of the inlet as described in that claim—to "deliver a dye solution," *id.* at 5:1–5—strongly implies that to "deliver" a substance means something different than to "selectively deliver" a substance, *see Phillips*, 415 F.3d at 1314 (the reference in a claim to "'steel baffles' . . . strongly implies that the term 'baffles' does not inherently mean objects made out of steel."); *see also id.* ("[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms."). Yet neither Anderson nor Red Rhino have proposed a construction that recognizes the distinction that

exists within the claim itself between "selectively" delivering a substance as opposed to simply delivering it. *See id.* ("[T]he context in which a term is used in the asserted claim can be highly instructive."). Anderson proposes construing both of those claim terms to require "inject[ion] or forc[ing]" of fluid or dye into the housing, both of which necessarily imply the deliberate choice by the user to introduce the substance into the housing. Anderson Br. at 10. Red Rhino proposes that both should be understood to mean allowing dye to be delivered through the inlet by natural hydrodynamic forces according to the presence or absence of a leak. Red Rhino Br. at 22, 25. Constructions of these terms that would elide any distinction between the delivery described in the third option and the selective delivery described in the first option must be rejected because it seems clear from the claim itself that those terms mean different things.

So what does "selectively" mean in this context? Anderson contends that to "selectively deliver" fluid means to deliver it "at the selection of the operator." Anderson Br. at 10. It points to a dictionary definition, arguing that "[t]he ordinary meaning of selectively is 'characterized by selection,' and 'selection' is synonymous with 'choice.'" *Id.* at 11 (quoting Dungan Decl. Ex. 13). It also argues from the testimony of its own expert, as a person with ordinary skill in the art, that "'selectively' means somebody has chosen to put this fluid someplace rather than another place. There's a choice being . . . done."[4] *Id.* (quotation and internal citation omitted). But such extrinsic evidence is less

---

[4]     This testimony simply reflects the expert's opinion and understanding of what "selectively" means in the context of this claim term, *see* Anderson Dep. at 87–88, but "expert testimony, which does not identify the 'accepted meaning in the field' to one skilled in the art" and which conveys only how the expert would construe a claim term based on

useful and less reliable than the intrinsic evidence provided by the claims themselves and the remainder of the specification, and it cannot be used to contradict the intrinsic evidence. *Phillips*, 415 F.3d at 1317–18; *Mantech*, 152 F.3d at 1373.

Here, the intrinsic evidence makes clear that Anderson's proposed construction of the term "selectively deliver" cannot be correct. Grammatically, the phrase "selectively deliver" as used in this claim term does not refer to the action of a sentient human operator, but to an "inlet," which is not sentient and is not capable of choice. '959 Patent at 5:1–2. It makes far more sense to construe the term "selectively deliver fluid through the inlet," *id.*, to mean the capacity of the inlet to "deliver, or not deliver, fluid through the inlet according to the operation of natural hydrodynamic forces and the presence or absence of a leak," *see* Red Rhino Br. at 22. This reading preserves the distinction present within the claim itself between delivery that is made selectively and delivery that is not.[5] Such a reading is also consistent with, and therefore supported by, the specification. *See generally Vitronics*, 90 F.3d at 1582 (the specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."). Here, the specification describes that an operator who is not in the water might use the device to test for leaks by connecting a hose to a barb inlet on the

---

his own reading is "unhelpful" to the claim-construction process, *Symantec Corp. v. Comput. Assocs. Int'l, Inc.*, 522 F.3d 1279, 1291 (Fed. Cir. 2008) (citation omitted).

[5]    This construction of the word "selectively" is also consistent with the use of that word elsewhere in claim 1 to describe a component subject to leak detection "selectively being a swimming pool light," '959 Patent at 4:60–61—that is, the component might be a swimming pool light, or it might be some other component.

device, running the hose to the surface of the pool, and injecting a dye solution into the hose; "[i]f there is a leak, the dye solution will be sucked into the barb that is functioning as an inlet," but if the component being tested is not leaking, "the dye will not be sucked in but instead maintain a natural swaying motion underwater." '959 Patent at 3:8–17. That preferred embodiment would not be possible under Anderson's proffered construction, in which both of the leak-detection applications described in claim 1 as using dye or fluid would be construed to require "inject[ing] or forc[ing a substance] into the inside of the housing" rather than relying on the presence of absence of a leak to either cause or not cause the dye to be sucked into the hose. *See* Anderson Br. at 10. To the contrary, reading claim 1 "in view of the specification, of which [it is] a part," *Phillips*, 415 F.3d at 1315 (citation omitted), requires rejecting Anderson's proffered construction of the term "selectively deliver fluid through the inlet," '959 Patent at 5:1–2, and instead construing it to mean to "deliver, or not deliver, fluid through the inlet according to the operation of natural hydrodynamic forces and the presence or absence of a leak," as described above, *see* Red Rhino Br. at 22.

By contrast, the term "deliver a dye solution," '959 Patent at 5:4–5, strongly implies that the delivery described in that term is *not* selective—that is, that the delivery or non-delivery of the dye does *not* depend on the operation of natural hydrodynamic forces and the presence or absence of a leak. Rather, plain old delivery—when juxtaposed elsewhere in the same claim with delivery that is made *selectively*—indicates that delivery is in fact achieved, regardless of the presence or absence of a leak. Red Rhino acknowledges that, if no leak is present within the defined perimeter about which the seal

of the engages, then natural hydrodynamic forces will not cause dye deposited somewhere outside the inlet to be drawn through the inlet. Red Rhino Br. at 21. Therefore, achieving "deliver[y of] a dye solution for leak detection purposes into the interior of [the device's] housing" when (as will sometimes be the case) no leak is present necessarily requires some amount of force or injection of the solution through the inlet. '959 Patent at 5:4–6. Such a construction finds further support elsewhere in the specification, which describes one preferred embodiment in which the operator "may dive underwater with a dye solution and inject it through [a] barb inlet using a syringe or the like." *Id.* at 3:19–20; *see generally Vitronics*, 90 F.3d at 1582.

Red Rhino points out that Anderson's expert has testified that a construction of this term that requires the injection of dye into the inside of the housing "is counter to the teaching of the specification and would render the invention inoperable." Red Rhino Br. at 25. Although the Federal Circuit has explained that "a construction that renders the claimed invention inoperable should be viewed with extreme skepticism[, . . .] that statement refers to a construction that would render all embodiments of a claimed invention inoperable, not a construction that might cover some inoperable embodiments." *Cordis Corp. v. Medtronic Ave, Inc.*, 511 F.3d 1157, 1174 (citing *Talbert Fuel Sys. Patents Co. v. Unocal Corp.*, 275 F.3d 1371, 1376 (Fed. Cir.), *vacated and remanded on other grounds*, 537 U.S. 802 (2002); *EMI Group N. Am., Inc. v. Cypress Semiconductor Corp.*, 268 F.3d 1342, 1349 (Fed. Cir. 2001)). Thus even if it were true that injecting dye into the housing would render the invention inoperable (and Red Rhino indicated at the hearing that its witnesses disagreed with Anderson's as to whether that was true), construing the term

"deliver a dye solution," '959 Patent at 5:4–5, to require the injection of a dye through the inlet and into the interior of the housing would not render all embodiments of the claimed invention inoperable, and thus is consistent with Federal Circuit precedent.

C

Claim 1 further includes a term describing "the seal being for effecting anchoring in a sealing engagement around the perimeter and being in a stationary non-movable position relative to the defined underwater surface of the swimming pool." *Id.* at 4:53–56. Anderson proposes construing the claim term "the seal being for effecting anchoring" to mean "the seal being for causing the device to be fixed or secured in one place." Anderson Br. at 13. In Anderson's proposed construction, the seal attaches the device to the underwater surface of the pool, independent of any other part of the device or force (such as gravity). *Id.* at 13–14. Red Rhino contends that no construction of the term is necessary and that the term should be given its plain and ordinary meaning. Red Rhino Opp. at 25.

Anderson argues that, in response to an office action dated December 4, 2015, Red Rhino distinguished its device from McGuigan, in part, on the basis that McGuigan "cannot be secured to a pool surface," but Red Rhino's device "attaches to the component" being tested. Dungan Decl. Ex. 2 at RR000300; *see also* Anderson Br. at 13. As part of the same package of amendments and responses, Red Rhino amended its description in claim 1 of the seal to include the term "the seal being for effecting anchoring." Dungan Decl. Ex. 2 at RR000295. Anderson contends that because at the time of Red Rhino's amendments and responses, claim 1 did not include the suction cup assembly that appears in the final version of the claim, the term "the seal being for effecting anchoring" must mean that the

seal itself, independent of any other part of the device, was sufficient to cause the device to attach securely to the component. *See* Anderson Br. at 13–14. Anderson relies on *Hakim v. Cannon Avent Group, PLC*, 479 F.3d 1313 (Fed. Cir. 2007), for the proposition that "an applicant cannot recapture claim scope that was surrendered or disclaimed," and thereby seems to implicitly contend that Red Rhino's alleged disclaimer of any seal that did not independently anchor the device to the component was sufficiently clear for prosecution disclaimer to attach. Anderson Br. at 14 (citing *Hakim*, 479 F.3d at 1317); *see also Aylus*, 856 F.3d at 1359 (prosecution disclaimer requires that the alleged disavowing statements be "both clear and unmistakable").

But other aspects of the prosecution history do not support Anderson's proffered construction and prevent the conclusion that that Red Rhino clearly and unmistakably limited the device to one in which the seal independently anchored the device to the component being tested. In distinguishing its invention from prior art on the basis that its device attaches to the component being tested, Red Rhino did not explicitly state or imply that it was the seal, independent of any other part or force (such as gravity) that caused the device to attach to the component. Dungan Decl. Ex. 2 at RR000300. To the contrary, from the time of the original application until the ultimate issuance of the patent, various iterations of claim 1 and the preferred embodiments consistently described how other elements, including a weighted member and a threaded shaft with a suction cup at its end, might hold or force the housing into a fixed position. *Id.* at RR000382–83; '959 Patent at 2:64–3:3 (one preferred embodiment describing a "weighted member" such as "a circular ring adapted to encircle [the] housing" and which "may be of sufficient weight, such as

10 pounds, to hold [the] device in position against [the] drain creating a seal." (figure numbers omitted)).  If the resilient seal already caused the device to be anchored or fixed in one location, as in the construction urged by Anderson, there would be no need to practice the invention in a manner described in this embodiment, in which the weighted member is used to create the seal.  Where nothing in the claims, the specification, or the prosecution history requires that the seal alone, as opposed to some other or additional feature, force, or application, cause the device to be fixed or anchored in one place, it would be improper to construe the claim term to include such a limitation.  *See Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1369 (Fed. Cir. 2012).  Nor would it be consistent with the ordinary meaning of the term "being for effecting anchoring" to mean that the seal independently causes "anchoring in a sealing engagement" as opposed to meaning that the seal serves as a necessary but not necessarily sufficient condition for causing "anchoring in a sealing engagement."  '959 Patent at 4:53–54; *see also* Anderson Br. at 15 (urging that the term "anchoring" be given its ordinary meaning).

Such a construction will be adopted because it is more consistent with the larger context of the claim, as well as with numerous references that appear throughout the specification and prosecution history to other things, such as a weight or a suction cup, that hold or force the device into a fixed position.  *See Phillips*, 415 F.3d at 1314 ("[T]he context in which a term is used in the asserted claim can be highly instructive."); *id.* at 1315 (claim should be construed "in view of the specification, of which [it is] a part" (citation omitted)).  The extrinsic evidence Anderson cites is less useful and less reliable than the intrinsic evidence provided by claim 1 itself, the remainder of the specification, and the prosecution

history, and such extrinsic evidence cannot be used to contradict the intrinsic evidence. *Phillips*, 415 F.3d at 1318; *Mantech*, 152 F.3d at 1373.

D

Anderson contends that the claim term "the defined underwater surface of the swimming pool being about a component related to being partly in a passage from inside the pool to a position removed from the surface" is indefinite, rendering claim 1 invalid. Anderson Br. at 15–16. Anderson's chief issue with this term seems to be that, as it contends, "[t]here is no meaning in this context to being 'in a passage' and also 'to a position removed from the surface.'" *Id.* at 15. Red Rhino contends that the term, in its entirety, requires no construction and should be given its plain and ordinary meaning. Red Rhino Br. at 29–30.

Patents are presumed valid. 35 U.S.C. § 282(a). "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). With the *Nautilus* standard, the Supreme Court attempted to strike a "delicate balance" between "the inherent limitations of language" and the need for a patent to be "precise enough to afford clear notice of what is claimed, thereby appris[ing] the public of what is still open to them." *Id.* at 909 (alteration in original) (quotation marks and citations omitted).

This claim term, plucked from the context in which it appears, admittedly is not a model of clarity. But read in light of the specification and prosecution history it does

inform those skilled in the art about the scope of the invention to a reasonable degree of certainty, as Red Rhino describes. *See generally* Red Rhino Br. at 30. The phrase "underwater surface" is defined earlier in the claim to mean "a defined area with a defined perimeter about which the seal engages." '959 Patent at 4:50–52. The Parties do not argue that construction of the term in any other respect involves anything "more than the application of the widely accepted meaning of commonly understood words." *See Phillips*, 415 F.3d at 1314 (citation omitted). The specification identifies examples of components that can be tested for leaks: "It is a[n] . . . object of this invention to provide such a system that can detect leaks at drains, lights, skimmers, suction and discharge lines, etc." '959 Patent at 1:35–37. All of those example components share the characteristic of "relat[ing] to being partly in a passage from inside the pool to a position removed from the surface" in that they are at least partly in a passage that has one portion "inside the pool"—that is, on or above the underwater surface of the pool—and another portion in a position that is "removed from the surface"—that is, a position that is not on or above the underwater surface of the pool. *Id.* at 4:58–59. The specification provides that "[l]eaks may occur around pool drains, pool lights, skimmers, suction and discharge lines and other pool surfaces," *id.* at 1:23–25, and Red Rhino distinguished the device from the prior art in part on the basis that the prior art is not capable of detecting leaks in swimming pool components, while Red Rhino's device could, Dungan Decl. Ex. 2 at RR000300. Thus, this term is not indefinite, and will be construed to mean "the defined area of the pool with a defined perimeter about which the seal engages, which area surrounds a component that is at least partly in a passage that has one portion on or above the underwater surface of the

pool and another portion in a position that is not on or above the underwater surface of the pool."

III

Red Rhino asserts claims for direct infringement (Count I), induced infringement (Count II), and contributory infringement (Count III). Compl. ¶¶ 11–25 [ECF No. 1]. Anderson asserts counterclaims for non-infringement (Countercl. Count I) and invalidity (Countercl. Count II). Countercl. ¶¶ 8–11 [ECF No. 14]. The Parties each move for summary judgment on all three counts of Red Rhino's Complaint. *See* ECF Nos. 62 (Anderson's motion "for summary judgment that Anderson does not infringe [the '959 Patent] and/or that the '959 Patent is invalid"), 79 (Red Rhino's motion for summary judgment on "Counts I, II and III of Red Rhino's Complaint"). Anderson's summary-judgment motion is drafted broadly enough to encompass its own counterclaims; Red Rhino's summary-judgment motion makes no reference to Anderson's counterclaims, but resolving the Parties' cross-motions as to Red Rhino's claims necessarily resolves Anderson's counterclaims, which seek declaratory judgments of non-infringement (in Count I) and invalidity (in Count II).

A

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if its resolution "might affect the outcome of the suit" under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255 (citation omitted).

B

"[A]pparatus claims cover what a device *is*, not what a device *does*." *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1468 (Fed. Cir. 1990). "Direct infringement of an apparatus claim requires that each and every limitation set forth in a claim appear in an accused product." *LifeNet Health v. LifeCell Corp.*, 837 F.3d 1316, 1325 (Fed. Cir. 2016) (internal quotation marks and citation omitted). Furthermore, induced infringement and contributory infringement require a showing of direct infringement, in addition to other elements. *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 851 (Fed. Cir. 2010) (inducement); *Refac Int'l, Ltd. v. IBM*, 798 F.2d 459, 460 (Fed. Cir. 1986) (contributory infringement). Given Anderson's admissions regarding its own device, and in light of the constructions described above, Anderson's device directly infringes the '959 Patent.

Anderson argues that because its accused product calls for users to deliver dye outside the housing, it cannot satisfy either of the claim limitations involving delivery of dye or fluid because those claim limitations call for dye or fluid to be injected or forced into the interior of the housing. Anderson Br. at 18. This argument is based on a faulty claim construction for the reasons described above. Anderson explains that its accused product calls for a user to administer dye into clear tubing which is outside the housing and which is attached to an opening in the housing. *Id.* at 19. If—and only if—there is a leak,

dye is pulled through the tubing and into the housing according to basic hydrodynamic principles. *Id.* But, as described above, that meets the structural limitation that an inlet "selectively deliver fluid through the inlet into the interior of the housing." '959 Patent at 5:1–3. Based on Anderson's admissions about its own accused product, there is no genuine issue of material fact that the accused product meets this claim term. Furthermore, as Anderson acknowledges, because the "selectively deliver" term is used in the disjunctive with other claim terms, including the "deliver a dye solution" term, '959 Patent at 5:1–5, Anderson may infringe the '959 Patent even if its accused product does not "deliver a dye solution," as construed above, *see* Anderson Br. at 21 arguing that ("[b]ecause [Anderson's device] does not meet any of the[] limitations," it does not directly infringe claim 1 or any dependent claim).

Anderson next argues that its accused product requires disassembly of the light to pinpoint the location of the leak, and that as a result of Red Rhino's global disclaimer of such devices, its product cannot infringe. Anderson Br. at 20. Because, as described above, Red Rhino has not made any such global disclaimer, summary judgment to Anderson is not warranted on this basis.

Third, Anderson argues that because it is the threaded rod and suction cup of its accused product, and not its seal, that causes the device to be fixed or secured in one place, it cannot infringe claim 1. *Id.* at 21. As described above, Anderson's proposed construction of this claim term is rejected, and summary judgment cannot be awarded to Anderson on this basis, either.

Finally, because the claim term requiring "the defined underwater surface of the pool being about a component related to being partly in a passage from inside the pool to a position removed from the surface," '959 Patent at 4:56–59, is not indefinite, as described above, summary judgment is not appropriate on that basis.

## C

Anderson next argues that, even if the Court rejects its proposed constructions of all four disputed claims, it nevertheless is entitled to summary judgment on a theory of invalidity. Anderson Br. at 23. Issued patents are presumed to be valid, and the burden is on Anderson, as the party challenging the validity of a patent, to show invalidity by clear and convincing evidence. *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1301 (Fed. Cir. 2002) (citation omitted).

It is a "century-old axiom of patent law" that "a product which would literally infringe if later in time anticipates [a patent] if earlier." *Upsher-Smith Labs., Inc. v. Pamlab, L.L.C.*, 412 F.3d 1319, 1322 (Fed. Cir. 2005) (internal quotation marks and citations omitted). Anderson contends that a prior-art device, the Aquadome,[6] which was

---

[6] The Parties dispute what evidence is or is not admissible with respect to the Aquadome device. For example, Anderson cites to certain photographs of the Aquadome, *see*, *e.g.*, Anderson Br. at 24, 31, 34, which Red Rhino contends are not authenticated and constitute inadmissible hearsay that cannot be considered at summary judgment, *see* Red Rhino Br. at 38 nn. 2–3. Anderson contends that Jon Harvey, a product technician at ALD who was at ALD when the Aquadome was developed and who, as a part of his job, now assembles the Aquadome product for ALD, recognized the objects depicted in the photographs as Aquadome components. Warzecha Decl. Ex. A-16 ("Harvey Dep.") at 6–8, 46 [ECF No. 92]. This dispute was not given adequate briefing and it need not be resolved at this time. In any event, the disputed photographs were not considered in analyzing Anderson's anticipation argument.

developed by American Leak Detection ("ALD") in 2004, anticipates the '959 Patent, rendering the patent invalid. Anderson Br. at 23–24. Red Rhino does not dispute Anderson's contention that, at least in most respects, the Aquadome meets the requirements of claim 1 of the '959 Patent. The sole distinction Red Rhino identifies between the Aquadome and claim 1 of the '959 Patent relates to the '959 Patent's requirement of a "threaded rod extending through [the device's] housing" and "terminating in a suction cup of a resilient material for anchoring said housing to an underwater surface." '959 Patent at 4:62–65; see also Red Rhino Br. at 38. Red Rhino argues that the Aquadome has a threaded *tube*, and that this *tube* is not a *rod*. *See* Red Rhino Br. at 39.

The Parties disagree as to precisely how the Court should resolve this dispute. No Party has asked the Court, in connection with the *Markman* proceedings, to construe the claim term calling for a "threaded rod"—or, more specifically, the term "rod," since Red Rhino does not dispute that the relevant feature of the Aquadome, whatever it is called, is threaded. *See* Red Rhino Br. at 39 (depicting a diagram of the Aquadome that included a written reference to a "threaded tube"); Warzecha Decl. Ex. A-15 ("Stevick Report") at 9 ("The Aquadome does not have a threaded rod . . . . Instead, the Aquadome has a threaded tube" or "threaded pipe.") [ECF No. 90 at 14]. At the hearing, Anderson took the position that determining the meaning of the term "rod" was essentially one of claim construction. At one point in its briefing, Red Rhino seemed to agree that "claim construction fundamentals must still apply" in determining the "ordinary meaning [of the term 'rod'] as one having skill in the art would understand the term in light of the specification and prosecution history." Red Rhino Br. at 40. But elsewhere in its brief and at oral argument,

it argued that "[a]t the very least, there is a material issue of fact to be resolved as to whether or not the Aquadome can anticipate Claim 1 of the '959 Patent." *Id.* at 41.

Whether a patent is invalid as anticipated is a two-step inquiry. "The first step of an anticipation analysis is claim construction; the second step in the analysis involves a comparison of the construed claim to the prior art." *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 175 F. App'x 350, 354 (Fed. Cir. 2006) (citation omitted). As in an infringement analysis, the claim-construction step is a question of law; the second step is a question of fact. *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1406 (Fed. Cir. 2004). As would be the case if either Party had requested construction of the term "rod," the term must be given its ordinary meaning to a person of ordinary skill in the art. *See Phillips*, 415 F.3d at 1313. Neither Party makes any argument about the proper construction of the term based on intrinsic evidence, and both rely exclusively on different sources of extrinsic evidence. Yet the claim itself, read as it would be by a person of ordinary skill in the art of detecting fluid leaks, strongly suggests that the threaded rod disclosed in claim 1 is solid, not a tube.

The specification describes the purpose of the invention as "provid[ing] a leak detecting system and a method for detecti[ng] leaks in water filled vessel[s], such as a swimming pool." '959 Patent at 1:32–34. Claim 1 describes the inlet as being located on the housing. *Id.* at 4:65–5:67 (disclosing a "housing" that is "hollow on its interior, coupled to the resilient seal . . . and having an inlet . . . ."). Thus, understanding the "rod" referenced in claim 1 to encompass the tube used in the Aquadome would introduce a second inlet through which fluid could pass from the exterior of the housing to the interior

of the housing. A person of ordinary skill in the art would understand that, by operation of basic principles of hydrodynamics, this second inlet would result in "an ambiguous leak detection . . . system" because "[t]he whole idea of the device is to seal off everywhere except the [one] opening" and "if you have more than one opening, you're not really testing for a leak." Stevick Dep. at 135–36.

At the hearing, Anderson suggested that the threaded rod and the inlet in the housing could be the same structure if the rod were a tube. But that would be inconsistent with the element of the claim calling for the rod to "terminat[e] in a suction cup of a resilient material for anchoring said housing to an underwater surface." '959 Patent at 4:63–65. If a threaded tube terminated in a suction cup that anchored the housing, then the suction cup would serve as a sort of plug that would prevent the threaded tube from performing the type of dual function Anderson suggests, and any inlet the tube might otherwise be able to provide would not "extend[] into the opening and [be] accessible from the exterior" because the plug would block any such access. Id. at 4:67–5:1.

The extrinsic evidence on which the Parties rely is somewhat less clear. Red Rhino's expert Glen Stevick opines, based on terms defined in a dictionary of scientific and technical terms, that "[a] rod is a thin, round bar, typically made of metal or wood," but a "pipe" is "a tube used to conduct a fluid."[7] Stevick Report at 9 (footnotes omitted).

---

[7]     Harvey, the ALD product technician, referred to this part of the Aquadome assembly as a "hollow tube" or a "suction cup stem" despite the invitation by Anderson's counsel to call it a "rod" or "hollow rod." Harvey Dep. at 47–48. Because it is not clear whether Harvey was speaking based on his personal reading of the term or based on the "accepted meaning in the field" to one skilled in the art of fluid-leak detection, it is not necessarily helpful in determining the meaning of the term to one of ordinary skill in the

But he does not offer a definition of a bar, and neither Party addresses whether a bar is necessarily solid or may also be hollow. Anderson points to extrinsic evidence that other rods quite apart from the leak-detection context that may be either hollow or solid—specifically curtain rods or lightning rods, or a reference in a lesson on torsion to the application of torque to rods that are, variously, solid or hollow, *see* Anderson Br. at 36–37 (citing Dungan Decl. Exs. 20–22)—but this evidence does not address the ordinary and customary meaning of the word "rod" to a person of ordinary skill in the relevant art—that is, the art of detecting fluid leaks, *Phillips*, 415 F.3d at 1313. It does not even say much about how an educated layperson, unfamiliar with the arts of curtain-rod or lightening-rod design or of arts relating to torque, would understand the term "rod." Anderson also points to testimony from its own expert, without further explanation, that a rod "can have a hole through the middle," Anderson Reply at 21 [ECF No. 100] but it is not clear whether he was speaking from his personal understanding of the term or based on the accepted meaning of the term in the relevant field, and it therefore is not helpful, *see Symantec*, 522 F.3d at 1291.

In short, although the extrinsic evidence offered by both Parties is somewhat inconclusive, the intrinsic evidence strongly suggests that a person of ordinary skill in the art of detecting fluid leaks would understand the term "rod" as used in the '959 Patent's threaded-rod assembly to be solid, not hollow. Because it is undisputed that the Aquadome

---

art. *See Symantec*, 522 F.3d at 1291. To the extent Harvey was articulating his understanding of the term as it would be used within the field of leak detection, however, it is consistent with the distinction drawn by Stevick between rods and tubes.

does not possess a threaded rod that is solid, the Aquadome does not anticipate every element of claim 1 of the '959 Patent. Accordingly, Anderson's argument that the '959 Patent is invalid on the basis of anticipation is rejected.[8]

D

In addition to its claim for direct infringement, Red Rhino also brings claims for induced infringement under 35 U.S.C. § 217(b) and contributory infringement under 35 U.S.C. § 217(c). Compl. ¶¶ 16, 20. Red Rhino seems to argue that, because Anderson directly infringed the '959 Patent, it necessarily is also liable for induced infringement and contributory infringement.

Induced infringement carries a requirement that the defendant must have had "knowledge that the induced acts constitute patent infringement" and must have possessed specific intent. *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011); *Cross Medical Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1312 (Fed. Cir. 2005) (citation omitted). The Federal Circuit has clarified that the plaintiff alleging induced infringement "has the burden of showing that the alleged infringer . . . knew or should have known [its] actions would induce actual infringements." *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1304 (Fed. Cir. 2006). Furthermore, the specific-intent requirement "necessarily includes the requirement that [the alleged infringer] knew of the patent." *Id.* (citation omitted). Red Rhino pointed to no evidence in its opening brief that

---

[8]    Because the Aquadome does not anticipate every element of claim 1, and therefore cannot render the '959 Patent invalid, the issue of whether the Aquadome constitutes prior art need not be considered. 35 U.S.C. § 102 (pre-AIA).

Anderson possessed the requisite specific intent. *See* Red Rhino Br. at 46–47. Evidence and argument Red Rhino improperly offered for the first time in its reply brief that Red Rhino contends demonstrates Anderson's knowledge will not be considered. *See generally* Red Rhino Reply at 14–16 [ECF No. 102]. Furthermore, to the extent Red Rhino argues that Anderson was willfully blind, it overplays its hand. Even as Red Rhino describes it, Anderson read the '959 Patent differently than Red Rhino did and did not hire a lawyer to confirm whether its reading was correct. *See id.* at 14–15. Although Anderson's proposed constructions are rejected, they are not frivolous and do not otherwise necessitate a finding of willful blindness. For these reasons, Red Rhino is not entitled to summary judgment on its claim for induced infringement.

Contributory infringement requires a patentee to prove that the defendant "knew that the combination for which its components were especially made was both patented and infringing" and that the defendant's components have "no substantial non-infringing uses." *Cross Medical*, 424 F.3d at 1312 (citation omitted). Again, Red Rhino's opening brief does not address those requirements or cite any evidence suggesting that the knowledge requirement is satisfied here. *See* Red Rhino Br. at 47. As with the induced-infringement claim, evidence and argument improperly made for the first time in Red Rhino's reply brief will not be considered, Red Rhino Reply at 14–16, and for the reasons described above, Red Rhino has not shown willfulness. Accordingly, Red Rhino is not entitled to summary judgment on its claim for contributory infringement.

**ORDER**

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      The motion of Defendant Anderson Manufacturing Company, Inc. to exclude the expert testimony of Glen Stevick [ECF No. 64] is **DENIED**;

2.      The disputed terms of U.S. Patent No. 9,464,959 are construed as set forth in the above opinion;

3.      Defendant Anderson Manufacturing Company, Inc.'s motion for summary judgment [ECF No. 62] is **DENIED** in all respects; and

4.      Plaintiff Red Rhino Leak Detection, Inc.'s motion for summary judgment [ECF No. 79] is **GRANTED IN PART** and **DENIED IN PART** as follows:

      a.  The motion is **GRANTED** with respect to its claim for direct infringement (Count 1 of Plaintiff's Complaint);

      b.  The motion is **DENIED** with respect to it claims for induced infringement (Count 2 of Plaintiff's Complaint) and contributory infringement (Count 3 of Plaintiff's Complaint); and

      c.  The motion is **GRANTED** with respect to Defendant's Counterclaims.

5.      Defendant Anderson's Counterclaims are **DISMISSED**.


Dated:  August 27, 2019          s/ Eric C. Tostrud
                                      Eric C. Tostrud
                                      United States District Court